Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9040 | **DATE** | 2/4/2003 |
| **CASE TITLE** | Donna M. Rhodes vs. IL Dept. of Transportation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [29-1] is granted. This case is hereby dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | FEB 0 5 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 40 |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RO | courtroom deputy's initials | 03 FEB -4 PM 4:58 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DONNA M. RHODES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 01 C 9040 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| ILLINOIS DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
FEB 0 5 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff Donna Rhodes sued her employer, the Illinois Department of Transportation ("IDOT") and IDOT employee Michael Poladian,[1] for gender discrimination, sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("the Act"), as amended, 42 U.S.C. § 2000e *et seq.* Specifically, Rhodes claims that Poladian assigned her work duties in a discriminatory manner, called her names and, along with other IDOT employees, kept pornographic magazines and videos at the work site which created a sexually hostile work environment. IDOT moves for summary judgment on all counts. For the following reasons we grant IDOT's motion in its entirety. (R. 29-1.)

---

[1] With respect to Poladian, Rhodes alleged slander and intentional infliction of emotional distress and sought punitive damages. Poladian moved to dismiss on the grounds that the claims were barred by the applicable statute of limitations. This Court granted Poladian's motion and dismissed Counts IV, V and VI of the complaint with prejudice on July 10, 2002. (R. 24-1.) Accordingly only Rhodes's claims of Title VII employment discrimination against IDOT survive.



## RELEVANT FACTS [2]

Rhodes was employed as a full-time, temporary Highway Maintainer for IDOT at the Arlington Heights maintenance yard ("Yard") for the three winter seasons spanning 1996 through 1999. (R. 30, Def.'s Facts, Ex. B, Rhodes Dep. at 12.) During her first two years of employment, Rhodes was the only female worker in the Yard. (*Id.* at 38.) Approximately 32 full-time and part-time employees worked at the Yard during this period. (*Id.*, Ex. EE, Mara Dep. at 48.) The top two positions at the Yard are the Technician and the Lead Lead Worker. (*Id.*, Ex. D, Poladian Aff. at ¶¶ 2-3.) During Rhodes's first two seasons John Nicholas was the Technician and Michael Poladian was the Lead Lead Worker. (*Id.*, Ex. B, Rhodes Dep. at 26-27.) In her last season Nicholas retired and was replaced by Matt Mara, (*id.*, Ex. B, Rhodes Dep. at 26-27; Ex. EE, Mara Dep. at 13, 23); Poladian remained the Lead Lead Worker, (*id.*, Ex. B, Rhodes Dep. at 27). All of the Yard workers reported to these two individuals, and Poladian and Mara were responsible for assembling crews and assigning tasks to Yard employees. Although Rhodes claims that the Technician or Lead Lead Worker assign less desirable job duties as a

---

[2] The Court normally derives the pertinent facts from the Local Rule 56.1 statement of undisputed material facts and counter-statement of material facts submitted by the parties. *See Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Statements of material facts are the vehicle through which counsel identifies the relevant facts and the evidence establishing those facts."). Here, IDOT, as the moving party, filed a statement in compliance with the local rules. In response, Rhodes admitted many of IDOT's facts, provided blanket denials to others, and also set forth more than fourteen pages of additional facts in her brief, some supported with citations to the record, others without. That was improper. *Id.* Rhodes should have filed a separate statement of additional facts pursuant to Local Rule 56.1(b)(3)(B), to which IDOT would have been required to respond. As a result of Rhodes's failure to strictly comply with the requirements of Local Rule 56.1, we could deem all of IDOT's facts admitted and disregard the morass of facts presented in Rhodes's brief. *Id.* We need not scour the record for factual support for Rhodes's contentions. *See Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001). Nevertheless, in the interest of time, thoroughness and fairness, we have reviewed the record and will decide which facts should be taken as true for purposes of summary judgment, and which should be disregarded.

form of punishment, (R. 35, Pl.'s Facts ¶ 17), neither the Technician nor the Lead Lead Worker are authorized to hire, fire, transfer, demote or discipline employees,[3] (R. 30, Def.'s Facts, Ex. C, Fulgenzi Aff. ¶¶ 18-19).

Winter-season Highway Maintainers are often referred to as "snowbirds." (*Id.*, Ex. C, Fulgenzi Aff. ¶ 21.) Snowbirds' job responsibilities include among other things: plowing roadways, patching potholes, trimming trees, washing and cleaning snow trucks, and general Yard maintenance. (*Id.*, Ex. B, Rhodes Dep. at 14-15; Ex. F, DiSomma Aff. at ¶¶ 3-4.) Part-time, seasonal snowbirds are sent letters at the beginning of each season informing them of their start date; that letter also includes the final day of the season and thus the final day of the snowbird's employment. (*Id.*, Ex. B, Rhodes Dep., Ex. 2, Hire Letter.) Although snowbirds occasionally leave a winter season early, their end date is not extended beyond the date indicated in the hire letter. (*Id.*, Ex. FF, Poladian Dep. at 63.) Rhodes received her hire letter at the beginning of the 1998-99 season informing her that her start date would be November 17, 1998 and her last day of work would be April 15, 1999. (*Id.*, Ex. B, Rhodes Dep., Ex. 2.)

Rhodes experienced few, if any, problems during her first two seasons at the Yard. She did not raise any complaints with respect to her coworkers, supervisors, pay or assignments, nor was she disciplined by IDOT. (*Id.*, Ex. B, Rhodes Dep. at 23-24.) Her reviews at the end of both seasons indicated that she was meeting IDOT's expectations. (*Id.*, Ex. FF, Poladian Dep., Ex. 1.) During her second season, however, Poladian began receiving complaints from motorists

---

[3] The Technician may, however, issue a "Report of Rule Infraction" if he believes that an employee has violated IDOT policy and may recommend to his superiors that discipline be imposed on the employee, but the final determination is made by IDOT's Administrative Services Manager. (*Id.*, Ex. C, Fulgenzi Aff. ¶¶ 7-15.)

3

that Rhodes's snow route was not plowed sufficiently or in a timely manner. (*Id.*, Ex. FF, Poladian Dep. at 23.) During that season Rhodes was assigned to snow route 12, which encompassed 36.9 lane miles. (*Id.*, Ex. B, Rhodes Dep. at 43; Ex. D, Poladian Aff. at ¶ 12.) It is customary for snowbirds to pitch in on others' routes when they have finished their own, (*id.*, Ex. B, Rhodes Dep. at 50), but Poladian noticed that Rhodes required help finishing her route more frequently than other snowbirds, (*id.*, Ex. D, Poladian Aff. ¶ 15). Accordingly, at the beginning of the 1998-1999 season Poladian suggested to Mara that Rhodes be given a different, shorter snow route that was closer to the Yard. (*Id.*, Ex. D, Poladian Aff. ¶ 16.) Mara agreed. (*Id.* at ¶ 20.)

Rhodes, who did not like her new snow route, asked Poladian why it had been changed and if she could have her old route back. (*Id.*, Ex. B, Rhodes Dep. at 46.) Poladian initially told Rhodes that she could not have the route back and that the decision was final. (*Id.*, Ex. B, Rhodes Dep. at 55.) When Rhodes asked Poladian if she could speak directly to Mara about it, Rhodes claims that Poladian threatened to "strangle" her if she did so. (*Id.*, Ex. B, Rhodes Dep. at 54-55.) Poladian denies ever making such a remark. (*Id.*, Ex. FF, Poladian Dep. at 19.) Nevertheless, Rhodes did speak to Mara about her changed snow route and Poladian's alleged comments. (*Id.*, Ex. B, Rhodes Dep. at 63.) Mara asked Rhodes to put her allegation in writing so that he could investigate it but she refused, so Mara referred the problem to his superior, Les Aling. (*Id.*, Ex. EE, Mara Dep. at 20.) Aling, who was an IDOT Operations Engineer, next spoke to Rhodes about her complaints but she did not get her old snow route back. (*Id.*, Ex. B, Rhodes Dep. at 63-65.) After Rhodes's meetings with Poladian, Mara and Aling, she claims that she was increasingly subjected to discrimination, harassment and retaliation. (*Id.*, Ex. B, Rhodes

4

Dep. at 68-69.) For example, Rhodes claims that Poladian punished her by forcing her to wash a truck in sub-zero temperatures, (*id.*, Ex. B, Rhodes Dep. at 103-04), assigning her to work in the Yard instead of on a road crew, (*id.*, Ex. B, Rhodes Dep. at Ex. 8), and ordering the Lead Worker not to allow her to drive the foreman's truck while others were patching potholes, (*id.*, Ex. GG, Morrison Dep. at 20).

Rhodes also claims that Poladian began calling her names such as "bitch" and "cunt"; Rhodes did not complain about the alleged name-calling and Poladian denies that he ever used those words. (*Id.*, Ex. B, Rhodes Dep. at 69-73; Ex. FF, Poladian Dep. at 50.) Around this same time Rhodes also began taking photographs of sexually related videos and magazines around the Yard, as well as taking notes of behavior that she considered discriminatory. (*Id.*, Ex. M, Rhodes Notes.) IDOT admits that from at least 1996 through 1998 there were pornographic magazines at the Yard. (*Id.*, Ex. JJ, Franzone Dep. at 11.) Mara testified that whenever he saw pornographic magazines at the Yard he would confiscate them. (*Id.*, Ex. EE, Mara Dep. at 13.) Additionally, during the same period Yard employees concealed a television in the mechanics' room of the Yard where they watched pornographic videos. (*Id.*, Ex. JJ, Franzone Dep. at 13.) The parties dispute whether Poladian viewed the videos; Poladian denies having done so, (*id.*, Ex. FF, Poladian Dep. at 5), while other IDOT employees testified in their depositions that Poladian was present when videos were shown, (*id.*, Ex. JJ, Franzone Dep. at 13-14; Ex. II, Caruso Dep. at 64-66). Rhodes never complained about the pornographic magazines, nor did she complain about the pornographic videos. (R. 30, Def.'s Facts ¶¶ 33, 35.) She never looked at the magazines or videos, nor were they shown to her by other Yard employees. (*Id.* at ¶¶ 36-38.) Sometimes cartoons of a sexual nature were posted on the employee bulletin board, which Rhodes would

5

remove. (*Id.*, Ex. B, Rhodes Dep. at 105-06.) On one occasion Rhodes found a pornographic picture taped to her locker. She took the photo to Mara and Poladian, who immediately held a meeting with Yard employees and told them that such conduct was not permitted. (*Id.*, Ex. D, Poladian Aff. ¶ 40.)

IDOT has a "zero tolerance" policy regarding discrimination and harassment in the workplace. (*Id.*, Ex. I, Ransom Aff. ¶ 3.) IDOT employs civil rights officers who distribute and post employment and civil rights materials in the Yards. (*Id.*, Ex. H, Brown Aff. ¶10.) These officers conduct yearly training sessions to "educate employees about their civil rights and IDOT's policies against discrimination, harassment and retaliation"; they also investigate any such claims as they arise. (*Id.* at ¶¶ 3-4.) During Yard training sessions the officers inform the employees of IDOT's complaint process and how to contact them if the employee feels that he is being treated in a discriminatory manner. (*Id.* at ¶ 5.) It is customary for IDOT to distribute its policy on sexual harassment to all female Highway Maintainers. (*Id.* at ¶ 8.) It is also customary for the officers to post newsletters at the yards that outline current information on civil rights issues as well as the phone number of IDOT's civil rights officers. (*Id.* at ¶ 10.) Similarly, Equal Employment Opportunity posters are prominently displayed in the yards. (*Id.* at ¶ 11.) In October 1998 the officers held a meeting and training session at the Arlington Heights Yard. They distributed written materials and explained Title VII issues, including gender discrimination and sexual harassment. (*Id.*, Ex. I, Ransom Aff. ¶ 5.)

On April 15, 1999, the last day of her employment for the season, Rhodes took the mandatory Highway Maintainer's test to maintain her eligibility for employment with IDOT. (*Id.*, Ex. C, Fulgenzi Aff. ¶ 25; Ex. X, Rhodes Application.) On that form Rhodes also requested

6

employment for the following winter season at the Arlington Heights Yard. (*Id.*) Because she was taking the test that morning she did not appear at the Yard at her scheduled time. (*Id.*, Ex. B, Rhodes Dep. at 114.) According to IDOT policy, if a Yard employee does not appear at the start of a shift and does not call the Technician or Lead Lead Worker before 8:00 a.m., that employee will be marked absent for the day. (*Id.*, Ex. Z, Attendance Policy; Ex. EE, Mara Dep. at 58-59.) Rhodes told Don Morrison, an acting Lead Worker (but not *Lead Lead* Worker), that she would be late to work because she was taking the Highway Maintainer's test. (*Id.*, Ex. GG, Morrison Dep. at 46.) Morrison instructed her to inform Mara or Poladian as well, but Rhodes did not do so. (*Id.*) Morrison did not have the authority to grant time off. (*Id.*, Ex. EE, Mara Dep. at 58-59.) Accordingly Rhodes was marked absent without pay. Because it was her last day of work for the season, she did not return to the Yard after April 15, but Rhodes admits that she was not terminated. (*Id.*, Def.'s Facts ¶ 80.) In fact, Rhodes was asked to return to IDOT as a snowbird for the 1999-2000 winter season and was asked to interview for a permanent Highway Maintainer position. (*Id.*, Ex. CC, Rhodes Dep. at 14; Ex. C, Fulgenzi Aff. ¶ 22.) She declined the offer. Presently before the Court is IDOT's motion for summary judgment. Rhodes alleges that IDOT discriminated against her because of her gender, subjected her to sexual harassment and retaliated against her.

## LEGAL STANDARDS

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We view all facts and inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*,

7

477 U.S. 242, 255 (1986). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. Indeed, where a party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," there can be no genuine issue as to any material fact. *Celotex*, 477 U.S. at 322-23.

## ANALYSIS

### I. Sex Discrimination Claim

Under Title VII it is unlawful for an "employer . . . to discriminate against any individual with respect to his . . . conditions . . . of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove that she was discriminated against on the basis of sex by producing either direct or indirect evidence of discrimination. *Bruno v. City of Crown Point, Ind.*, 950 F.2d 355, 361 (7th Cir. 1992). Although Rhodes claims to have direct evidence of discrimination, we can find no such support in the record; accordingly we turn to the indirect, burden-shifting method articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-03 (1973). Under that test, the claimant must establish a *prima facie* case of discrimination. If she succeeds, the employer must articulate a legitimate, non-discriminatory reason for its employment action, and in response the claimant must prove that the employer's proffered reason is a pretext for discrimination. *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002). In order to establish a *prima facie* case, Rhodes must demonstrate that: (1) she was a member of a protected class; (2) she was performing her job satisfactorily; (3) she experienced an adverse employment action; and (4) similarly situated individuals were treated more favorably. *Id.*

Rhodes no doubt meets the first prong. The second prong is a closer call. Although it appears that IDOT received complaints during Rhodes's second season about her handling of her snow route, her year-end evaluations demonstrated that she was generally meeting IDOT's expectations. Additionally, there is no indication that Rhodes was not meeting IDOT's expectations during the 1998-99 winter season, which is the relevant time frame. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002) (noting that "the question is not whether at any time in [Plaintiff's] employment he was meeting his employer's expectations; the question is whether he was meeting his employer's expectations at the time he was terminated"). Thus we hold that Rhodes sufficiently established the second prong of her *prima facie* case.

The fourth prong also is not clear-cut. Rhodes alleges that she was treated differently than her male coworkers in that: (1) she was required to wash her truck in sub-zero weather; (2) she was assigned to the Yard for three days in April 1999 instead of to a road crew; (3) her snow route was changed; and (4) Poladian instructed her crew leader not to permit Rhodes to drive the truck while the crew leader and other Highway Maintainers worked on the road. But Rhodes *admits* that: (1) each snowbird was required to wash his or her own truck after a snowstorm, (*id.*, Def.'s Facts ¶ 84);[4] (2) on the days she was assigned to the Yard, between five and sixteen other men were assigned to the Yard with her, (*id.* at ¶¶ 110-112); (3) other male employees had their snow routes changed, (*id.* at ¶ 96); and (4) "Poladian never had to similarly instruct any Lead Worker regarding male Highway Maintainers because he had never seen any male Highway

---

[4] IDOT also submitted proof that on the day that Rhodes claims she was forced to do so in sub-zero temperatures, the weather was well above freezing. (*Id.*, Ex. Y, January 1999 Climatological Data).

9

Maintainers driving the foreman's truck and failing to perform their duties as frequently as he saw that with Plaintiff," (*id.* at ¶ 107). Thus, we hold that Rhodes has failed to satisfy the fourth prong of her *prima facie* case.

Even if we were to presume that Rhodes satisfies these prongs, she still would not meet her *prima facie* burden because she cannot show that she suffered an adverse employment action. Rhodes claims that she suffered an adverse employment action because: (1) she was not allowed to drive the lead worker's truck on a job; (2) her snow route was changed; (3) she was marked absent without pay on her last day of work; and (4) she was required to wash her truck in cold weather. Adverse employment action must have some "tangible job consequence" such as "a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Traylor*, 295 F.3d at 788; *see also Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998). Rhodes was not fired, demoted, suspended, and did not suffer a decrease in pay.

It is also well established that differences in treatment that have "little or no effect on an employee's job" and changes in the conditions or terms of employment that are nothing more than "a mere inconvenience or alteration of job responsibilities" do not amount to an adverse employment action. *Togba v. County of Cook*, 48 F. Supp. 2d 1104, 1110 (N.D. Ill. 1999) (*quoting Sweeney*, 149 F.3d at 556). A temporary assignment of undesirable duties does not constitute an adverse employment action, especially where those duties are a part of the employee's job description. *Mangano v. Sheahan*, No. 00 C 3953, 2002 WL 1821738, *7 (N.D. Ill. Aug. 7, 2002). Thus, Rhodes cannot claim that washing the truck, being denied the privilege

of driving the Lead Worker's truck or having a new snow route amounted to an adverse employment action.

Nor is Rhodes's claim that she suffered an adverse employment action when she was marked absent without pay any more persuasive. As noted above, disciplinary suspensions may be adverse employment actions. *See Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336, 341 (7th Cir. 2001). But Rhodes's marked absence was non-disciplinary in nature; we doubt that a routine personnel action constitutes an adverse employment action. *See Russell*, 243 F.3d at 341-42; *Williams v. Bristol-Meyers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (noting that a transfer involving no reduction in pay and no more than a minor change in working conditions cannot constitute adverse employment actions because "[o]therwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit"). We conclude that the only consequences Rhodes claims to have suffered are insufficient to amount to a "tangible job consequence" and thus she cannot show that she suffered an adverse employment action. Because Rhodes fails to establish a *prima facie* case of sex discrimination, we need not shift the burdens to address whether IDOT's actions were legitimate or mere pretext for illegal discrimination. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 331-32 (7th Cir. 2002).

## II. Sexual Harassment Claim

To prevail on her claim of sexual harassment based on hostile work environment Rhodes must establish that: (1) she was subjected to unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her

11

because of her sex; and (4) there is a basis for employer liability. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002). In order to establish a "hostile work environment," the plaintiff must submit evidence showing that she was subjected to conduct "so severe or pervasive as to alter the conditions of [her] employment and create an abusive working environment." *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 462-63 (7th Cir. 2002) (internal quotations and citation omitted). Moreover, to qualify as "hostile," the work environment must be "both objectively and subjectively offensive . . .." *Hilt-Dyson*, 282 F.3d at 463.

The parties, apparently agreeing that the conditions under which Rhodes worked were sufficient to establish a hostile work environment, focus instead on the fourth prong of the test: whether or not employer liability exists in this case. As the Supreme Court has clarified, an employer's liability hinges on whether the harasser is the victim's supervisor or merely a co-worker. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Hall*, 276 F.3d at 355. Where the harasser is a supervisor and the victim suffered no tangible employment action, an employer is strictly liable, subject to a possible affirmative defense. *Faragher*, 524 U.S. at 807. On the other hand, employers are liable for a co-worker's harassment only when they have been negligent in discovering or remedying the harassment. *Parkins v. Civil Constrs. of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998).

The Seventh Circuit construes the role of "supervisor" very narrowly for purposes of Title VII. *See Hall*, 276 F.3d at 355-56. A supervisor is an individual who has the authority to "hire, fire, demote, promote, transfer or discipline" an employee. *Id.* at 355. "[T]he fact that an employer authorizes one employee to oversee aspects of another employee's job performance does not establish a Title VII supervisory relationship" because an individual is not a supervisor

12

unless he has authority to "directly affect" the terms and conditions of the victim's employment. *Id.* In *Hall*, the plaintiff argued that her harasser qualified as a Title VII supervisor because he: (1) possessed the authority to direct her work operations; (2) provided input into her performance evaluations; and (3) was charged with training her and other less-experienced employees. *Id.* In rejecting this argument the Seventh Circuit emphasized that nothing in the record indicated that the employer entrusted the harasser with the authority to "hire, fire, demote, promote, transfer or discipline" the employee. *Id.* Like *Hall*, although Mara and Poladian managed the Yard employees' work assignments and investigated complaints and disputes among the employees, they did not have the authority to make any decisions affecting the terms and conditions of Yard workers' employment.[5]

Because Rhodes cannot establish that Mara and Poladian had supervisory authority under Title VII, IDOT is liable only if it was negligent either in discovering or remedying the harassment. *Hall*, 276 F.3d at 356; *Schele v. Porter Mem'l Hosp.*, 198 F. Supp. 2d 979, 989 (N.D. Ind. 2001) (an employer is not liable if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees). The critical question is whether the employer had notice of the harassment. *Durkin v. City of Chi*, 199 F. Supp. 2d 836, 848 (N.D. Ill. 2002). "[W]hen . . . the only possible source of notice to the employer . . . is the employee who is being harassed," the employee plaintiff "cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some

---

[5] Rhodes's only response to IDOT's assertion that Mara and Poladian could not hire, fire, promote, demote, discipline or transfer any employee is that Mara and Poladian engaged in *de facto* discipline and transfers by making life extremely difficult for workers at the Yard. (R. 35, Pl.'s Facts at ¶¶ 17-18.) Such assertions do not establish that Mara and Poladian were her supervisors for purposes of Title VII.

13

probability that she was being sexually harassed." *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996). Alternatively, a plaintiff may demonstrate that, even absent formal complaints, an employee's harassing conduct permeated the workplace so that the employer must have known of it. *Id.* at 1018-19 ("[t]he sheer pervasiveness of the harassment might support an inference that the employer must have known of it"). Under either approach, however, we must remember that "the law against sexual harassment is not self-enforcing," *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014 (7th Cir. 1997), and without knowledge of harassing conduct, there is nothing an employer can do beyond the general policies and training to ensure compliance with Title VII, *Cooke v. Stefani Mgmt. Servs., Inc.*, 250 F.3d 564, 569 (7th Cir. 2001).

In this case IDOT points out that its sexual harassment policy identifies those persons who accept complaints of discrimination or harassment. Additionally, contact sheets with names and telephone numbers, along with civil rights newsletters and posters, are displayed in the Yard. These materials direct aggrieved employees to contact the civil rights officers with complaints. IDOT further notes that although Rhodes claims to have been subjected to frequent sexual harassment, she admits that she only complained about harassing conduct once. And during the single instance that she did complain—when the pornographic photo was taped to her locker—Rhodes admits that Mara and Poladian immediately called a meeting where they stressed that such material was prohibited in the Yard and that such conduct would not be tolerated.

Rhodes responds in turn that IDOT must have been aware of the pornography because it permeated the workplace over the course of several years. Further, Rhodes claims that the meetings where Mara and Poladian informed Yard employees that such conduct would not be

14

tolerated was a farce because Poladian was an active participant in viewing the pornographic materials. But even if we construe the facts in the light most favorable to Rhodes, as we must, and assume that Poladian was involved in viewing the pornographic movies and magazines, Rhodes still has not established that IDOT was aware of the goings-on. First, we have uncovered no evidence in the record establishing prior complaints about the pornography at the Yard, so its presence there for several years is not conclusive as to IDOT's knowledge. Second, the record is clear that Mara discarded magazines when he saw them, never watched a pornographic movie, and did not even know that there was a television in the Yard. (R. 30, Def.'s Facts, Ex. II, Caruso Dep. at 66.) Finally, employees testified that the men kept a "lookout" stationed to alert them if a woman or outsider was approaching while they were viewing the illicit films. (*Id.*, Ex. II, Caruso Dep. at 63.) Thus, although it appears that several Yard workers viewed the pornography over the years, if Mara, as the highest-ranking employee at the Yard, did not know about it and there is no evidence of prior complaints about it, we cannot assume that those higher in the chain of command at IDOT knew about it. Accordingly, we cannot conclude that the pornography was so pervasive so as to impute knowledge to IDOT. Rhodes's sexual harassment claim fails.

### III. Retaliation Claim

Finally, Rhodes claims that IDOT retaliated against her when it marked her absent without pay on her last day of employment. Under Title VII, an employer is prohibited from discriminating against an employee because that employee has opposed any practice deemed unlawful under the Act. 42 U.S.C. § 2000e-3(a). Rhodes has presented no direct evidence of retaliation, so we again must employ the *McDonnell-Douglas* indirect method of proof. To

establish a *prima facie* case of retaliation, the plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Hilt-Dyson*, 282 F.3d at 465. If the employee satisfies her *prima facie* case then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. "If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, [it] is entitled to summary judgment. Otherwise there must be a trial." *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Rhodes fails to satisfy the first, third and fourth prongs of her *prima facie* case. First, Rhodes did not engage in statutorily protected activity simply by complaining about her snow route and the alleged threat Poladian made to her. *See* 42 U.S.C. § 2000e-3(a) (it is illegal "to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]").[6] In addition, as noted above, she did not suffer an adverse employment action, nor was she treated less favorably than her male coworkers. Again, Rhodes has failed to establish her *prima facie* case and accordingly her retaliation claim fails.

---

[6] Indeed, Rhodes does not seriously address this prong in her brief. In support she simply states that her "employment was a statutorily protected activity" and that she "can withstand the Motion for Summary Judgment because there are genuine issues of fact." (R. 33, Pl.'s Mem. at 23.) Such blanket allegations are insufficient to meet her *prima facie* burden. *See, e.g., Smith v. Allstate Ins. Corp.*, 24 F. Supp. 2d 870, 879 (N.D. Ill. 1998).

16

## CONCLUSION

We sympathize with Rhodes because it appears that she worked in a sexually tinged environment that is wholly inappropriate in modern-day workplaces. While IDOT has survived this lawsuit, it is abundantly clear to this Court that IDOT must take stronger, proactive measures to insure that its female workers are not faced with the unfortunate situation borne by Rhodes at her workplace. Rhodes's lawsuit fails because she simply has not adduced sufficient evidence to create a material fact issue on her sex discrimination, sexual harassment and retaliation claims. In particular, her failure to alert IDOT to her unfortunate workplace environment doomed her sexual harassment claim. Thus we must grant IDOT's motion for summary judgment in its entirety. (R. 29-1.) The Clerk is instructed to enter final judgment pursuant to Federal Rule of Civil Procedure 58 against Rhodes.

ENTERED: _____
Judge Ruben Castillo
United States District Court

Dated: February 4, 2003